**United States District Court**

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WELLS FARGO BANK NORTHWEST, N.A., | No. C-04-1535 EMC |
| Plaintiff, | |
| v. | **ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| POLARIS HOLDING COMPANY, | |
| Defendant. | **(Docket Nos. 32, 43)** |
| _____/ | |

Plaintiff Wells Fargo Bank Northwest, N.A. ("WF") is the owner trustee of two trusts created to hold title to two Boeing airplanes. The beneficiary of the trusts is Triton Aviation Finance ("TAF"). In 1999, WF entered into two agreements with Polar Air Cargo, Inc., which was at the time an affiliate of Defendant Polaris Holding Co. Pursuant to these agreements, Polar leased the two airplanes from WF. Some time after the lease agreements were executed, Polaris promised to pay WF up to six months of rent due under each agreement in the event that Polar defaulted in the payment of rent. The thrust of WF's current suit against Polaris is that Polaris failed to live up to its promise to pay the six months of rent after Polar defaulted. WF's complaint alleges causes of action for (1) breach of contract and (2) declaratory relief.

**United States District Court**

For the Northern District of California

1    Pending before the Court are the parties' cross-motions for summary judgment.[1]  Having

2  considered the parties' briefs and accompanying submissions, as well as the oral argument of

3  counsel, the Court hereby DENIES both WF's and Polaris's motion for summary judgment.

## I.    FACTUAL & PROCEDURAL BACKGROUND

5    The relevant factual background is largely covered in the parties' Pretrial Stipulation No. 1.

6  A.    Lease Agreements Between WF and Polar

7    WF entered into two lease agreements with Polar, dated September 24, 1999, under which

8  Polar leased two Boeing airplanes.  *See* Stip. ¶ 1 & Ex. 1.  A letter agreement (hereinafter "Letter

9  Agreement No. 1") was also entered into by WF and Polar on that same day, which was an "integral

10  part of each Aircraft Lease Agreement."  *Id.* ¶ 2; *see also id.*, Ex. 2.

11  B.    Letter Agreement Between WF and Polaris

12    At the time of the lease agreements and Letter Agreement No. 1, Polar was owned by General

13  Electric Capital Aviation Services, Inc. ("GECAS").  *See id.* ¶ 5.  In July 2001, GECAS agreed to

14  sell Polar to Atlas Air Worldwide Holdings, Inc. ("Atlas").  *See id.*  As required by a provision in the

15  lease agreements, Polar and GECAS sought WF's consent to the sale of Polar to Atlas.  *See id.* ¶ 6.

16  In exchange for WF's consent, Polaris entered into a letter agreement, dated October 23, 2001

17  (hereinafter "Letter Agreement"), pursuant to which Polaris made a promise to WF in the event that

18  Polar should default in payment of rent with respect to the leased airplanes.  *See id.* ¶ 7 & Ex. 4.

19  More specifically, the Letter Agreement provided in relevant part as follows:

20          1.    Polar Rent Default.  Should Polar default in payment of any
         installment of basic rent under either Lease when due and fail
21        to cure such default within the applicable grace period, PHC
         [*i.e.*, Polaris] promptly upon receipt of your [*i.e.*, WF's] notice
22        hereunder will make payment of such installment and for the
         five-month period beginning on the date of such notice will pay
23        each subsequent rent installment (*i.e.*, up to a total of six such
         installments) when and as the same shall come due under such
24        Leave; *provided, however*, that no such rent installment shall
         apply to any period beyond the term now in effect under such
25        Leases; and *provided, further*, that it is understood and agreed,

26  _____

27      [1] The Court shall cite to WF's motion for summary judgment as "Mot."; Polaris's cross-motion
   for summary judgment and opposition to WF's motion as "Opp'n"; WF's opposition to Polaris's cross-
   motion for summary judgment and reply to WF's opposition as "Reply"; and Polaris's reply to WF's
28  opposition and sur-reply as "Sur-Reply."

for the avoidance of doubt, that only one such notice may be given as to each Lease and that the support afforded hereby shall be available only for one continuous period of five months from the date thereof and not for any subsequent rent default of Polar under such Lease.

2.  <u>Rights to Reimbursement/Offset.</u>  PHC's obligations under the preceding paragraph shall be subject to reimbursement or offset, as the case may be, to the extent of any such rent installments paid in arrears by Polar and to the extent of any rent payable for the same period by any other party under a re-lease of the aircraft in question.  Further, as of the date of disposition of any such aircraft, PHC's obligations shall cease with respect thereto.

3.  <u>Remarketing Obligation.</u>  With a view to mitigating PHC's obligations hereunder, you agree to proceed promptly and in good faith, following your giving of any notice under paragraph 1 above, to take all commercially reasonable steps in the remarketing and re-leasing of the aircraft that such notice concerns.  PHC's obligations hereunder shall survive the early termination of the Lease of such aircraft and shall continue for the full six-month period in accordance with paragraph 1, notwithstanding the foregoing sentence and the acceptance of such aircraft by a replacement lessee; provided that PHC's obligations in such event shall be limited to the amount, if any, by which the rent payable by the replacement lessee shall be less than the basic rent which would have been payable by Polar under the Lease had such Lease not been terminated.

*Id.*, Ex. 4.  The parties agree that the Letter Agreement is "a legally binding and enforceable agreement."  *Id.* ¶ 8.

C.   <u>Polar's Filing of Bankruptcy and WF's Proof of Claim</u>

On January 30, 2004, Polar filed for bankruptcy protection in Florida.  *See id.* ¶¶ 9, 14.  Polar subsequently defaulted in the payment of rent for both the airplanes, which was due on February 5, 2004.[2]  *See id.* ¶ 10.  Shortly thereafter, Polar notified WF that Polar would not pay any further rent installments; Polar also said that it intended to use its powers under the Bankruptcy Code to reject the leases and return the airplanes to WF.  *See id.* ¶ 11.  On or about February 9, 2004, WF demanded that Polaris pay the rent due by Polar on February 5, 2004, and each of the five subsequent

---

[2] Under the lease agreements, both Polar's voluntary petition for bankruptcy and its failure to pay rent constituted a default.  *See* Stip., Ex. 1, at 39-40.  However, the Letter Agreement between WF and Polaris specified that Polaris would have an obligation to pay the six months of rent only upon a default in rent payment by Polar.  *See id.*, Ex. 4.

1   rent installments (*i.e.*, from March to July 2004). *See id.* ¶ 12 & Ex. 5. On February 12, 2004, Polar

2   returned the airplanes to WF. *See id.* ¶ 13.

3       On March 19, 2004, WF filed the instant suit in state court. The case was subsequently

4   removed to federal court by Polaris.

5       On April 8, 2004, WF filed a proof of claim with the bankruptcy court. *See id.* ¶ 14 & Ex. 6.

6   In the proof of claim, WF asked for rent (both from before and after the petition for bankruptcy),

7   costs related to Polar's failure to return the airplanes in compliance with the "return conditions" set

8   forth in the lease agreements, and other miscellaneous costs (*e.g.*, shipping costs, insurance costs,

9   storage costs). *See id.* ¶ 15. The claim totaled more than $36 million. *See id.*

10  D.    Security Deposits and Maintenance Reserves Held by WF

11      At the time that WF submitted its claim to the bankruptcy court, WF held (1) security

12  deposits paid by Polar for the planes, totaling more than $390,000 and (2) "maintenance reserves"

13  collected from Polar, totaling more than $16.8 million (for a total of about $17.2 million). *See id.* ¶

14  21.

15      Maintenance reserves are discussed in Letter Agreement No. 1 entered into by WF and Polar.

16  Basically, maintenance reserves were monthly payments made by Polar to WF, the amount of which

17  depended on the amount of usage of the planes. *See id.*, Ex. 2, at 5-6. Polar could get

18  reimbursement from WF from the maintenance reserves after Polar incurred maintenance expenses –

19  that is, so long as the expenses were verified by WF and there was no default by Polar. *See id.* at 7-

20  9.

21      Lease Agreement No. 1 specified that, "on the Return Occasion [*i.e.*, the event that occurs

22  when possession of the aircraft is returned from Polar to WF at the end of the term of the lease or

23  upon WF taking possession pursuant to § 18 of the lease agreement[3]], any amounts remaining in the

24  Maintenance Reserves shall be retained by Lessor on the Return Occasion or other termination of the

25  Lease." *Id.* at 10. Letter Agreement No. 1 also specified that, "[p]ursuant to the California Uniform

26  Commercial Code, [Polar] grants a possessory security interest in the Security Deposit and the

27

28      [3] Section 18 of each lease agreement provided for remedies available to WF as lessor in the event of default.

4

**United States District Court**

For the Northern District of California

Maintenance Reserves as security for all obligations of [Polar] under the Lease . . . . Upon and following an Event of Default, and in addition to all other rights that [WF] may have under the Lease and as a secured party under the California Uniform Commercial Code, [WF] may use, apply or retain all or any portion of the Security Deposit and the Maintenance Reserves to apply toward losses, damages or expenses that [WF] may suffer or incur as a result of [Polar's] failure to perform any other obligation under the Lease." *Id.* at 10-11. Similarly, § 18 of the Lease Agreement specified that,

> upon and following an Event of Default, [WF] may use, apply or retain all or any portion of the Security Deposit and the Maintenance Reserves as follows:
>
> (i)   first, to compensate [WF] for any sums it may in its discretion advance to perform any of [Polar's] obligations to maintain and return the Airframe, the landing gear, the APU and the Engines in the condition required by this Lease; and
>
> (ii)  the balance in the Maintenance Reserves, if any, to apply toward [Polar's] obligations under this Lease.

*Id.*, Ex. 1, at 44.

WF did not tell the bankruptcy court about either the security deposits or the maintenance reserves. *See id.* ¶ 22. In addition, WF did not tell the bankruptcy court about maintenance expenses that Polar had already incurred for which it was due reimbursement by WF. *See id.* ¶ 24. Polar claims that the maintenance expenses incurred totaled some $7.1 million. *See id.* ¶ 23.

E.   Resolution of WF's Claim Submitted to Bankruptcy Court

Polaris knew that WF had submitted a claim to the bankruptcy court. *See id.* ¶ 27. Polaris did not submit a claim of its own to the bankruptcy court. *See id.* ¶ 28.

Polar objected to WF's claim. *See id.* ¶ 29. Polar and WF then entered into settlement discussions. *See id.* ¶ 30. On June 10, 2004, Polar filed with the bankruptcy court an "omnibus objection" which included a discussion of WF's claim. *See id.* ¶ 31 & Ex. 8. In the objection, Polar stated that it "disputes amount of [WF's] claim [*i.e.*, $36 million]. *The dispute has been settled*." *Id.*, Ex. 8 (emphasis added). The recommended disposition was "[r]educe [claim] and allow as an unsecured claim in the amount of $15,000,000." *Id.* Polaris received and/or was aware of this filing by Polar. *See id.* ¶ 32.

On July 1, 2004, WF's bankruptcy counsel sent to Polar's counsel a draft Settlement Agreement. *See id.* ¶ 37 & Ex. 12. The draft Settlement Agreement provided that WF's claim would be allowed in the amount of $15 million; that $4 million out of the $15 million would be allocated to rent due WF; and that the remaining amount would be allocated to the costs related to Polar's failure to return the airplanes in compliance with the "return conditions" set forth in the lease agreements and other miscellaneous costs. *See id.*, Ex. 12, at 3.

The draft Settlement Agreement also specified that nothing in the agreement "is intended to, or does: (i) release, exonerate or discharge Polaris from its obligations under or liability on the Polaris [Letter] Agreement; or (ii) settle, compromise, offset, release, exonerate, discharges or otherwise affect the Polaris Rent Payment Obligation or any claims that [WF] has asserted in the Polaris Action." *Id.*

The draft Settlement Agreement further stated: "Nothing in this Settlement Agreement or the settlement it document is intended to, or does, release or discharge or otherwise limit in any way Polaris's recourse against Polar. Nothing in this Settlement Agreement, or the settlement it documents, is intended to alter materially, to Polaris's detriment, Polaris's obligation on the Polaris Rent Payment Obligation." *Id.* at 4.

Finally, the draft Settlement Agreement stated that Polar "shall reconcile any claim by Polaris against [Polar] or any of them arising from the Polaris [Letter] Agreement as appropriate under applicable law in [Polar's] Chapter 11 Cases." *Id.*

On July 16, 2004, Polar, its parent Atlas, and other affiliated companies filed with the bankruptcy court a "Final Modified Second Amended Joint Plan of Reorganization of the Debtors." *See id.* ¶ 33 & Ex. 9. On the same day, the bankruptcy court issued an order confirming the Final Modified Second Amended Joint Plan of Reorganization." *See id.* ¶ 35 & Ex. 11. The order provided, *inter alia*, that all debts and claims against Polar were discharged and released and that persons who were or might be holders of debts or claims against Polar were enjoined from taking action against Polar. *See id.*, Ex. 11, at 4-6. Polaris received and/or was aware of this order. *See id.* ¶ 36.

Another draft Settlement Agreement was exchanged between WF and Polar several months later (on September 28, 2004). *See* Stip., Ex. 14. That draft was substantially the same as the above draft Settlement Agreement. Neither WF nor Polaris gave Polaris a copy of, or notice of, the draft Settlement Agreement. *See id.* ¶ 42. The draft Settlement Agreement was never executed. *See id.* ¶ 43.

In October 2004, WF and Polar agreed upon the language of an order sustaining Polar's objection to WF's claim before the bankruptcy court. *See id.* ¶ 44. The bankruptcy court signed the agreed-upon order on October 12, 2004. *See id.* ¶ 45. Under the order, WF's claim was allowed as a general unsecured claim in the amount of $15 million. *See id.*, Ex. 15. All other claims of WF related to the airplanes and the lease agreements were disallowed. *See id.* at 2-3. Prior to entry of the order, WF never gave notice to Polaris of the order. *See id.* ¶ 46. Polaris never consented to the order. *See id.* ¶ 47.

On or about October 12, 2004, consistent with the terms of Polar's reorganization plan, WF's beneficiary (TAF) received as an unsecured creditor 60% of the $15 million claim – *i.e.*, $9 million. *See id.* ¶ 49.

F.    Re-leasing of Aircraft by WF

As noted above, Polar returned the two airplanes to WF on February 12, 2004. *See id.* ¶ 13. WF re-leased the planes to Tradewinds at a reduced rent compared to the rent that Polar had paid. *See id.* ¶ 51. The airplanes, however, were not actually turned over to Tradewinds until October 7, 2004, and December 2, 2004, because WF had to overhaul and refurbish the planes in order to return them to service. *See id.* ¶¶ 51-52. The parties have agreed that the expenses incurred by WF to return the planes to service were reasonable. *See id.* ¶ 52.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v.*

United States District Court

For the Northern District of California

1    *Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . .

2    will be insufficient; there must be evidence on which the jury could reasonably find for the

3    [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the

4    light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the

5    nonmovant's favor.  *See id.* at 255.

6        Where the plaintiff has the ultimate burden of proof, it may prevail on a motion for summary

7    judgment only if it affirmatively demonstrates that there is no genuine dispute as to every essential

8    element of its claim.  *See River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1462 (9th

9    Cir. 1992).  In contrast, where the plaintiff has the ultimate burden of proof, the defendant may

10    prevail on a motion for summary judgment simply by pointing to the plaintiff's failure "to make a

1    showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

2    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

3    ### III.   PARTIES' ARGUMENTS

4            As a preliminary matter, the Court must address whether the Letter Agreement between WF

5    and Polaris is a contract of guaranty.  WF asserts that it is; Polaris equivocates, calling the Letter

6    Agreement a "'rent back-stop,'" Opp'n at 1, as opposed to "a general, unconditional 'guaranty' to

7    [WF] against any losses it may have incurred in its dealings with Polar."  Sur-Reply at 1.

8            Under California Civil Code § 2787, "[a] surety or guarantor is one who promises to answer

9    for the debt, default, or miscarriage of another, or hypothecates property as security therefor."  Cal.

10   Civ. Code § 2787.  Comments to the Restatement (Third) on Suretyship and Guaranty – on which

11   California courts have relied[4] – note that the secondary obligation of the guarantor (also known as

12   the secondary obligor) need not be identical to the underlying obligation of the debtor (also known as

13   the primary obligor).  *See, e.g.*, Rest. (3d) Suretyship & Guaranty § 1, cmt. k ("The secondary

14   obligation need not be identical to the underlying obligation.  The secondary obligation can be for a

15   smaller amount or of a different character, so long as the essential purpose of the secondary

16   obligation is to protect the obligee against the actual or potential nonperformance of the underlying

17   obligation by giving the obligee recourse against the secondary obligor.").

18           Whether an agreement is a contract of guaranty essentially depends on the intent of the

19   parties.  *See Ingalls v. Bell*, 43 Cal. App. 2d 356, 366 (1941) ("As long as [an] agreement

20   establishe[s] the intention of creating a contract of guaranty, no set words and form [are] required.");

21   *see also Everts v. Matteson*, 21 Cal. 2d 437, 449 (1942) ("[T]he terms of the instrument and the

22   circumstances under which it was made determine the character and extent of the undertaking.  The

23   contract will be fairly construed to effect the object for which it was given and to accomplish the

24   purpose for which it was designed, and the use of the word 'guaranty' in the instrument is not

25   conclusive in determining its character.").

26           Here, the Letter Agreement on its face indicates that the intent of the parties was to create a

27   ────────────

28   [4] *See, e.g.*, *Central Building, LLC v. Cooper*, 127 Cal. App. 4th 1053, 1059-61 (2005) (relying on Restatement).

**United States District Court**

For the Northern District of California

contract of guaranty.  In the Letter Agreement, Polaris promised to answer for a default in rent

payment by Polar.  *See* Cal. Civ. Code § 2787 ("A surety or guarantor is one who promises to answer

for the debt, default, or miscarriage of another, or hypothecates property as security therefor.").  That

Polaris limited its secondary obligation is not material; as noted above, the secondary obligation of

the guarantor need not be identical to the underlying obligation of the debtor.  "Where a contract is

clear and unambiguous, it is interpreted by the language therein without resort to extrinsic evidence.

Such interpretation is a question of law which may be resolved on summary judgment."  *Niederer v.

Ferreira*, 189 Cal. App. 3d 1485, 1499 (1987).  Accordingly, the Court concludes that there is no

genuine dispute that the Letter Agreement between WF and Polaris constitutes a contract of guaranty

under California Civil Code § 2787.[5]

Having determined that the Letter Agreement is a contract of guaranty, the Court now turns

to the parties' main arguments on summary judgment.

A.    WF's Argument

WF argues that it should be awarded summary judgment because there is no genuine dispute

that Polaris breached the Letter Agreement under which it promised to pay WF up to six months of

rent upon receipt of notice of Polar's default in payment of rent.  *See* Mot. at 10.  WF also contends

that there is no genuine dispute that it will not be unjustly enriched if Polar is ordered to pay the six

months of rent because, even though WF held $17.2 million in Polar security deposits and

maintenance reserves[6] and netted approximately $8 million from the Polar bankruptcy proceeding,

Polar's default actually damaged WF (and the beneficiary TAF) in the amount of more than $31.2

million – leaving a difference of some $6 million (*i.e.*, $31.2 million - $17.2 million - $8 million =

---

[5] Notably, Polaris has not offered any extrinsic evidence to the Court showing that the intent of the parties was other than to create a contract of guaranty.  Indeed, what extrinsic evidence there is indicates that Polaris considered the Letter Agreement a contract of guaranty.  *See* Lewis Decl., Ex. 5 (e-mail, dated 3/7/03, from B. McCarthy of GECAS to various persons) ("As part of the Polar sale we provided Triton with a *rent guarantee* for up to six months on 2x 747-200s in the event Polar doesn't make its lease payments.") (emphasis added); *see also* Supp. Sheft Decl., Ex. 1 (Lancelot Dep. at 17-18) (stating that it was his understanding that Polaris "would back stop *or guarantee* [$4,500,000] worth of losses") (emphasis added).

[6] *See* Stip. ¶ 21 (stating that WF held (1) security deposits paid by Polar for the planes, totaling more than $390,000 and (2) "maintenance reserves" collected from Polar, totaling more than $16.8 million).

**United States District Court**

For the Northern District of California

1  $6 million).  *See id.* at 11-12.  Even if Polaris paid the six months of rent, which could cost as much

2  as $4.5 million,[7] this would still leave WF with a loss of $1.5 million (*i.e.*, $6 million - $4.5 million

3  = $1.5 million).  *See id.*

4  WF calculated the $31.2 million figure above – *i.e.*, the damages allegedly caused by Polar's

5  default – as follows:

6  (1)  $18.9 million, which represents the cost WF incurred in overhauling and refurbishing the

7  planes (after returned by Polar) in order to return them to service (to Tradewinds).  *See* Stip.

8  ¶¶ 51-52.  The parties have agreed that the expenses incurred by WF to return the planes to

9  service were reasonable.  *See id.* ¶ 52.  According to WF, this figure only represents its costs

10  as of May 27, 2005.  *See* Mot. at 6-7 n.7 (noting that costs incurred or expected to be incurred

11  *after* 5/27/05 include (1) leasing of engines because certain engines failed after delivery of

12  the planes to Tradewinds) and (2) a heavy maintenance check for one airplane that will take

13  place much earlier than it would have if the aircraft stayed with Polar).

14  (2)  $60,000, which represents legal expenses incurred by WF in connection with the Polar

15  bankruptcy.

16  (3)  $82,000, which represents the ferry expenses paid to get the aircraft back from Polar.

17  (4)  $26,000, which represents the costs incurred in storing the aircraft before delivery to

18  Tradewinds.

19  (5)  $132,000, which represents insurance costs.

20  (6)  $12 million, which represents lost rent.  According to WF, this figure "already accounts for

21  payments Wells Fargo/TAF is scheduled to receive under the new Tradewinds leases."  Mot.

22  at 11; *see also* Brinkman Decl., Ex. B (calculating lost rent).

23  *See* Mot. at 11.

24  B.  Polaris's Argument

25  In turn, Polaris makes several arguments in support of its own motion for summary judgment

26  and in opposition to WF's motion.  The main arguments are as follows.

27  ───────────────

28  [7] WF asserts that the six months of rent is worth $4.5 million; Polaris contends that the six months of rent is worth $4.05 million.  *See* Mot. at 5 n.5.

**United States District Court**

For the Northern District of California

1   First, Polaris asserts that there is no genuine dispute that WF has already been fully

2   reimbursed for the six months of rent.  Polaris points out that WF's 30(b)(6) witness, Raquel

3   Brinkman, conceded at her deposition that, from a cash standpoint, WF ended up with $6.8 million

4   more than what it cost WF to put the airplanes back into service.  *See* Def.'s Exs. (Brinkman Dep. at

5   52-53).  This is because WF got approximately $16.8 million in maintenance reserves and $9 million

6   from the bankruptcy settlement for a total of $25.8 million.  *See id.* (Brinkman Dep. at 53-54).

7   Subtracting maintenance and other related costs of approximately $18.9 million left WF with $6.8

8   million (*i.e.*, $25.8 million - $18.9 million = $6.8 million).  *See id.* (Brinkman Depo. at 50-51, 54-

9   55).  WF, however, did not apply that $6.8 million to rent but rather to future maintenance costs on

10  the airplanes.  Polaris contends *inter alia*, that this contravened California Civil Code § 1479, which

11  requires that debts be extinguished in the order of earliest date of maturity if neither the debtor nor

12  the creditor has specified how the money in payment of the debts is to be allocated.  *See* Cal. Civ.

13  Code § 1479.

14  Second, Polaris contends that WF entered into a settlement with Polar without Polaris's

15  knowledge or consent, and the release of Polar from its principal obligation pursuant to the

16  settlement exonerated Polaris from its secondary obligation under California Civil Code § 2819.

17  *See* Cal. Civ. Code § 2819 ("A surety is exonerated, except so far as he or she may be indemnified

18  by the principal, if by any act of the creditor, without the consent of the surety the original obligation

19  of the principal is altered in any respect, or the remedies or rights of the creditor against the

20  principal, in respect thereto, in any way impaired or suspended.  However, nothing in this section

21  shall be construed to supersede subdivision (b) of Section 2822."); *see also id.* § 2822(b) ("For

22  purposes of this section and Section 2819, an agreement by a creditor to accept from the principal

23  debtor a sum less than the balance owed on the original obligation, without the prior consent of the

24  surety and without any other change to the underlying agreement between the creditor and principal

25  debtor, shall not exonerate the surety for the lesser sum agreed upon by the creditor and principal

26  debtor.").

27  ///

28  ///

**IV.   ALLOCATION OF BANKRUPTCY PAYMENT AND SECURITY**

**DEPOSITS/MAINTENANCE RESERVES**

The parties do not dispute that WF received $9 million from the bankruptcy proceeding and had in its possession about $17.2 million in security deposits and maintenance reserves, for a total of $25.8 million.  Even taking into account WF's claim that it netted only some $8 million from the bankruptcy proceeding, this would still leave WF with a sum of approximately $24.8 million. Subtracting from this sum the costs and expenses identified by WF in categories (1) through (5) above, *see* page 11, *supra*, WF would be left with almost $5.8 million (as Ms. Brinkman testified in her deposition), albeit with still some $12 million in rent owed by Polar.  A portion of this $12 million -- at most $4.5 million -- was guaranteed by Polaris under the Letter Agreement between WF and Polaris.  The question is to which portion of the $12 million in rent was the $5.8 million allocated?  Did it cover or exclude the (up to) $4.5 million guaranteed by Polaris (rent from February through July 2004)?

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

**United States District Court**

For the Northern District of California

A.     Polaris is not Entitled to Summary Judgment Based on the Lease Agreement

Polaris argues that WF should have applied the $5.8 million toward that part of the rent guaranteed by Polaris because, under the Lease Agreement, *any* rent installment paid by Polar could be used as an offset by Polaris.  However, the terms of the Lease Agreement are not as clear as Polaris would have it.  The Letter Agreement provides that, "[s]hould Polar default in payment of any installment of basic rent, . . . [Polar] promptly upon receipt of your notice hereunder will make payment of such installment and for the five-month period beginning on the date of such notice will pay each subsequent rent installment (*i.e.*, up to a total of six such installments) . . . ."  Stip., Ex. 4 at 1 (emphasis added).  "[Polar's] obligations under the preceding . . . shall be subject to reimbursement or offset, as the case may be, to the extent of *any such rent installments* paid in arrears by Polar."  *Id.* (emphasis added).  Summary judgment cannot be granted to Polaris because "any such rent installment" does not unambiguously mean, as Polaris contends, any installment of rent.  The use of the word "such" creates sufficient uncertainty so as to preclude summary judgment.  *See Maffei v. Northern Ins. Co.*, 12 F.3d 892, 898 (9th Cir. 1993) ("Whether a contract provision is ambiguous is a question of law.  If it is, ordinarily summary judgment is improper because differing views of the intent of parties will raise genuine issues of material fact."); *National Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983) ("Ambiguity in a contract raises a question of intent, which is a question of fact precluding summary judgment."); *Alexander v. Codemasters Group Limited*, 104 Cal. App. 4th 129, 147 (2002) ("[T]hat phrase appears ambiguous on the record before us and, as such, presents a question to be resolved by the trier of fact.").  Given the use of the word "such," it begs the question to what portion of defaulted rent the $5.8 million was allocated.

B.     WF is not Entitled to Summary Judgment Based on the Allocation of Payments

WF argues that Polar and/or WF had the right to allocate the $5.8 million as they saw fit and that none of the $5.8 million -- whether that amount came from the bankruptcy proceeding, the security deposits/maintenance reserves, or some combination of both -- was allocated to the rent guaranteed by Polaris.  Thus, the question for the Court is whether the $8 million from the bankruptcy proceeding and whether the $17.2 million in security deposits/maintenance reserves were ever allocated by Polar and/or WF and, if so, to what portion of the Polar obligation.

**United States District Court**

For the Northern District of California

1.     <u>Allocation of Bankruptcy Payment</u>

The parties agree that the issue of allocation of the $8 million from the bankruptcy proceeding is governed by California Civil Code § 1479.[8] Section 1479 provides as follows:

> Where a debtor under several obligations to another, does an act, by way of performance, in whole or in part, which is equally applicable to two or more of such obligations, such performance must be applied as follows:
>
> One -- If, at the time of performance, the intention or desire of the debtor that such performance should be applied to the extinction of any particular obligation, be manifested to the creditor, it must be so applied.
>
> Two -- If no such application be then made, the creditor, within a reasonable time after such performance, may apply it toward the extinction of any obligation, performance of which was due to him from the debtor at the time of such performance; except that if similar obligations were due to him both individually and as a trustee, he must, unless otherwise directed by the debtor, apply the performance to the extinction of all such obligations in equal proportion; and an application once made by the creditor cannot be rescinded without the consent of [the] debtor.
>
> Three -- If neither party makes such application within the time prescribed herein, the performance must be applied to the extinction of obligations in the following order; and, if there be more than one obligation of a particular class, to the extinction of all in that class, ratably:
>
> > 1.     Of interest due at the time of the performance.
> >
> > 2.     Of principal due at that time.

---

[8] At the hearing, Polaris did suggest that, in spite of what it argued in its papers, § 1479 should not be applicable at all. However, this argument was tied to Polaris's contention that WF could not make an allocation of any payment by Polar after the dispute had already arisen. *See* pages 18-19, *infra*. The Court rejects this contention for the reasons discussed below.

Neither party has argued that § 1479 is not applicable on the basis that the $8 million bankruptcy payment by Polar was not voluntary in nature. *See Ohio Elec. Car Co. v. Le Sage*, 198 Cal. 705, 709 (1926) (stating that § 1479 "governs the application of payments voluntarily made by the debtor, or by the creditor if the debtor fail to make such application"; adding that "'[n]either the debtor nor the creditor has a right to make an application of an involuntary payment, and the rules governing the application of voluntary payments by the court where neither party has applied them do not govern involuntary payments'"). It appears that, for an involuntary payment, it is the duty of the court to make the allocation, with such allocating being "made in such a manner, in view of all the circumstances of the particular case, as will best protect and maintain the rights of all parties." *Id.* at 710; *see also id.* at 709 (adding that "'[u]sually the application by the court will be *pro rata*, but in some jurisdictions involuntary payments insufficient to pay all claims are applied by the court so as to pay the unsecured rather than the secured claims'").

United States District Court

For the Northern District of California

3.    Of the obligation earliest in date of maturity.

4.    Of an obligation not secured by a lien or collateral undertaking.

5.    Of an obligation secured by a lien or collateral undertaking.

Cal. Civ. Code § 1479.[9]

a.    Debtor Allocation

The first issue is whether Polar, as the debtor, expressed any intent at the time it made the bankruptcy payment as to how the $8 million bankruptcy payment should be allocated.  According to WF, based on the deposition testimony of David Lancelot (CFO of Polar), there is no genuine dispute that Polar specifically designated the bankruptcy payment to cover anything *but* Polaris's obligation for the six months of rent owed in 2004.  There is testimony from Mr. Lancelot that could be interpreted to support WF's position.[10]  *See, e.g.*, Supp. Sheft Decl., Ex. 1 (Lancelot Dep. at 26) (agreeing that the six months of rent guaranteed by Polaris was excluded from the $15 million between WF and Polar).

However, other parts of Mr. Lancelot's testimony could be taken to mean that he believed that the $15 million payment was meant to cover the entirety of the dispute between WF and Polar, including the six months of guaranteed rent.  *See id.* (Lancelot Dep. at 15-16) (stating that WF and Polar arrived at the $15 million figure by going line item by line item what each felt it was entitled to -- "we were using the amount of maintenance that we had performed, that we had billed [WF] [*i.e.*, $7 million] and the amount that we had already prepaid in maintenance [*i.e.*, some $20 million] as an offset to the remaining rent [owed by Polar to WF]").  Notably, Mr. Lancelot testified that, if WF

---

[9] *See also Jessup Farms v. Baldwin*, 33 Cal. 3d 639, 652 (1983) ("We are persuaded . . . that subdivision Three, read as a whole, establishes by its terms that subsections 1 to 5 constitute the 'classes' of obligations to be given priority for purposes of allocating unspecified payments."); *id.* at 653 n. 11 (stating that "a secured note with an earlier maturity date than an unsecured note [will] have priority under subsection 3 over the unsecured note (subsec. 4), notwithstanding the policy of giving less secure instruments priority").

[10] Polaris has objected to portions of the Lancelot testimony cited by WF on the basis of repetitive and leading questions and relevance.  Those objections are overruled.

were going to receive $4.5 million from Polaris, "I would have taken my claim and reduced it by the amount that he was entitled to from [Polaris], but this -- *this was not a[] [Polaris obligation [and] I couldn't negotiate on behalf of something that I wasn't obligated to pay*." *Id.* (Lancelot Dep. at 21) (emphasis added).  This testimony could be interpreted to mean that Mr. Lancelot considered the Polaris obligation completely independent and so did not account for it one way or the other. Moreover, even though the draft Settlement Agreement between WF and Polar specified that Polaris's obligation was excluded from the bankruptcy payment, Mr. Lancelot testified at his deposition that WF and Polar's agreement "would be silent as to what the amounts were attributable to on the settlement." *Id.* (Lancelot Dep. at 33).  In fact, Polar never actually signed the draft Settlement Agreement.  Finally, Mr. Lancelot has filed a declaration stating that the settlement included the rent guaranteed by Polaris.[11]

Thus, there is a genuine dispute of fact regarding Polar's intent as to whether Polaris's obligation would be included in or excluded from WF's bankruptcy $15 million claim.  Moreover, the Court notes that there is also a genuine issue of fact (since no evidence was presented) as to the Polar's intent as to how the actual payment from the bankrupt estate (60% of the $15 million claim) would be allocated -- *i.e.*, even if Polar intended the $15 million claim to address all rent, including that guaranteed by Polaris, how was the 60 cents on the dollar to be allocated?

      2.      Creditor Application

            a.      Allocation/Application of Bankruptcy Payment

---

[11] Because the deposition testimony of Mr. Lancelot is ambiguous, the Court does not find his declaration, submitted by Polaris in support of its position, to be a "sham declaration."  As the Ninth Circuit has stated:

> While this court has held that a party may not "create his own issue of fact by an affidavit *contradicting* his prior deposition testimony," the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition; minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit.

*Messick v. Horizon Indus., Inc.*, 62 F.3d 1227, 1232 (9th Cir. 1995) (emphasis added).  The Court therefore denies WF's request to strike his declaration.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Summary judgment in favor of WF is also precluded on the second prong of § 1479 because there is a genuine dispute of fact as to whether WF, as the creditor, made an allocation (or "application" as that term is used in § 1479) to obligations other than that guaranteed by Polaris and did so within a reasonable time after the bankruptcy payment was made. WF asserts that there is no genuine dispute that it made such a timely application to Polar's obligations *other* than the six months of rent guaranteed by Polaris. It cites as proof the deposition testimony of Raquel Brinkman (TAF's Director of Finance and Accounting). *See* Lewis Supp. Decl., Ex. 1 (Brinkman Dep. at 53, 63) (claiming that $8 million received from bankruptcy was applied as a "negative maintenance expense" in October 2004, *i.e.*, the same month that the payment was made). In response, Polaris contends that, as a matter of law, under § 1479, an application must be made *before* any dispute arises, and that the instant dispute arose in March 2004 when WF filed suit against Polaris, prior to any allocation of the bankruptcy payment received by WF in October 2004. *See* Opp'n at 5 (citing *In re Corradini*, 276 B.R. 571, 576 (W.D. Mich. 2002) (stating that, under Michigan law, if debtor does not direct how allocation should be made, "'the creditor may apply [the payment] as he pleases either at the time of payment or afterwards, if before the controversy arises concerning it'"), and *Diesel Serv., Inc. v. Accessory Sales, Inc.*, 205 Neb. 381, 386 (1980) ("A debtor paying money has the right to direct its application, but if he fails to do so, the creditor may make the application at any time before suit is brought.")).

The Court addresses first Polaris's contention. While the above cases cited by Polaris are not controlling, being non-California law, there is California law consistent with the above cases. *See, e.g.*, *Joy v. Rousseau*, 72 Cal. App. 179, 184 (1925) ("The rule also seems to be that where the debtor has made no designation, the creditor, if entitled to make application, must make the application before suit is brought."). The problem here is that the above cases, including *Joy*, contemplate situations in which payment is made by the debtor before the dispute arose, thus giving the creditor an opportunity to apply the payment before the dispute. In the instant case, the creditor had no such opportunity. Bankruptcy was filed before the dispute over the guaranteed rent arose. Given the bankruptcy filing, no payment could have been made until reorganization was approved or unless the bankruptcy court authorized special approval. The dispute preceded any possible payment. Polaris

**United States District Court**

For the Northern District of California

1   has not presented to this Court any case with this factual scenario where it is impossible for a

2   creditor to make an allocation before the dispute arises.

3   　　　　Under the literal terms of § 1479, all that is required is application by the creditor within a

4   "reasonable time" after payment, and WF has presented evidence that the bankruptcy payment by

5   Polar and application of that payment by WF both took place in October 2004.  Polaris has not

6   presented any statutory authority or case law establishing a rule which disables a creditor from

7   making a timely application of payment as required by § 1479 under these circumstances.  Indeed, at

8   least one court has found that a creditor's application made promptly upon debtor payment is valid

9   even if made after the dispute arises.  *See Gaston v. Barney*, 11 Ohio St. 506, 513 (1860) ("[T]he

10  creditor could not be expected to apply the payments until the claims placed in his hands were

11  collected.").  Neither the literal wording of § 1479 nor logic requires a contrary result.  The Court

12  rejects Polaris's argument.

13  　　　　As for WF's assertion that there is no genuine dispute that it made a timely application of the

14  $8 million to a Polar obligation other than the six months of rent guaranteed by Polaris, the Court

15  finds there is a genuine dispute of fact.  The sole evidence that supports WF's timely application is

16  the testimony of Ms. Brinkman.  As noted by the Third Circuit, "a court should be reluctant to grant

17  a motion for summary judgment when resolution of the dispositive issue requires a determination of

18  state of mind, for in such cases much depends upon the credibility of witnesses testifying as to their

19  own states of mind, and assessing credibility is a delicate matter best left to the fact finder." *United*

20  *States v. 717 S. Woodward St.*, 2 F.3d 529, 534 (3d Cir. 1993) (internal quotation marks omitted);

21  *see also* 10A Wright, *et al.*, Fed. Prac. & Proc. Civ. 3d § 2730 (stating that courts should be cautious

22  in granting motion for summary judgment when resolution of dispositive issue requires

23  determination of state of mind; when state of mind is involved, credibility often will be central to the

24  case); *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979) (stating that award of

25  summary judgment is seldom appropriate in disputes in which "particular states of mind are decisive

26  as elements" of the claim or defense); *Consolidated Elec. Co. v. United States*, 355 F.2d 437, 438

27  (9th Cir. 1966) ("When an issue requires determination of state of mind, it is unusual that disposition

28  may be made by summary judgment."); *Anderson v. United States*, 746 F. Supp. 15, 19 (E.D. Wash.

1990) (denying plaintiff's motion for summary judgment because core factual question was

plaintiff's credibility and defendant was entitled to test that credibility under oath).

This is particularly true "if the credibility of the movant's witnesses is challenged by the

opposing party and specific bases for possible impeachment are shown."  10A Wright, *et al.*, Fed.

Prac. & Proc. Civ. 3d § 2726.  *See, e.g.*, *Typeright Keyboard Corp. v. Microsoft Corp.*, 374 F.3d

1151, 1158 (Fed. Cir. 2004) (in patent case, stating that several facts raised doubts as to credibility of

witnesses' testimony that document was publicly distributed in 1986 -- *e.g.*, document was not dated,

testimony related to events from years past so witnesses' recollection was possibly faulty, testimony

was tentative, witnesses were paid for their time testifying).  Here, there are specific facts that

provide a basis for questioning Ms. Brinkman's credibility on the question at issue.  For example, the

interests of Ms. Brinkman, as an employee of TAF, are clearly aligned with WF.  She did not offer

the testimony about the timeliness of the allocation until well after this lawsuit was already filed

against Polaris.  Moreover, there is no other evidence to support her claim of timely application of

payment, whether testimonial or documentary.  There is, *e.g.*, no entry in a ledger or other

accounting document.  In fact, there is no contemporaneous documentation at all corroborating her

testimony herein.  Finally, the 2004 financial statement submitted by WF does not speak to *when* the

allocation of the bankruptcy payment was made.[12]

Finally, summary judgment in favor of WF is not appropriate on the present record even if

Ms. Brinkman's testimony is fully credited because § 1479 only permits allocation by a creditor of a

payment applied at the time of the payment "toward the extinction of any obligation performance of

which was due to him from the debtor at the time of such" payment.  Cal. Civ. Code § 1479.  In

other words, a payment must be applied to an already existing obligation, not to a future obligation

not yet due.  *See also* L.S. Rogers, Application of Payments as Between Debts for Which a Surety or

Guarantor Is Bound and Those for Which He Is Not, 57 A.L.R.2d 855, at *3c (noting that payment

---

[12] Polaris has objected to the 2004 financial statement.  *See* Sur-Reply at 2.  The objection that the financial statement was "fabricated with an eye toward litigation" is overruled.  *Id.*  Such an objection goes to the weight of the evidence, not its admissibility.  As for Polaris's objection that the financial statement is unsigned, undated, and preliminary, it is moot in light of Polaris's indication at the hearing that it was willing to accept WF's representation that the final financial statement stated the same as the preliminary with respect to the allocation of the $8 million bankruptcy payment.

1  by debtor can be applied to debts *already due* but cannot be retained to pay debts *not yet due*).  The

2  parties have not submitted evidence clearly establishing the amount of the existing obligation to

3  which the bankruptcy payment could have applied.  Even though Ms. Brinkman testified that she

4  applied the $8 million bankruptcy payment in October 2004 to maintenance expenses, she does not

5  state what portion of the $18.9 in maintenance expenses owed by Polar to WF were *existing*

6  obligations as of the alleged application in October 2004.[13]  *See* Supp. Lewis Decl., Ex. 1 (Brinkman

7  Dep. at 53) (stating that she applied the bankruptcy payment "as a negative maintenance expense").

8       Accordingly, the Court concludes that, with respect to the $8 million bankruptcy payment by

9  Polar to WF, there are genuine disputes of fact regarding both debtor intent to allocate and creditor

10  application of payment, thereby precluding summary judgment in favor of WF.

11        b.   <u>Allocation of Security Deposits/Maintenance Reserves</u>

12       As a preliminary matter, the Court first addresses WF's argument that Polaris should not be

13  able to look to the $17.2 million in security deposits and maintenance reserves.  According to WF,

14  although California Civil Code § 2849 provides that "[a] surety is entitled to the benefit of every

15  security for the performance of the principal obligation held by the creditor," Cal. Civ. Code § 2849,

16  Polaris "waived any rights conferred" by the statute because Polaris denied the surety relationship

17  and failed to "formally demand that Wells Fargo/TAF pursue all available remedies against Polar."

18  Reply at 10.

19       The argument is without merit.  First, Polaris has not denied the surety relationship; rather, it

20  has simply claimed that the Letter Agreement between WF and Polaris is not "a general,

21  unconditional 'guaranty' to [WF] against any losses it may have incurred in its dealings with Polar."

22  Sur-Reply at 1.  Second, with respect to § 2849, Polaris has not asserted the defense in an untimely

23  manner,[14] *see, e.g.*, Answer ¶ 18 (alleging that WF "holds funds that (a) were or are the property of

24

25       [13] Should WF demonstrate that all of the maintenance obligations existed at the time of the

26  application (the re-leased planes were delivered to Tradewinds in October and December 2004), this issue may be handled in an in limine motion.

27       [14] The cases cited by WF regarding an untimely assertion of the § 2849 defense are

28  distinguishable because, in those cases, the defense was asserted at a much later stage in the proceedings.  For example, in *Sukut-Coulson, Inc. v. Allied Canon Co.*, 85 Cal. App. 3d 648 (1978), the defendant "consistently denied *any* liability . . . under the bonds," including at trial.  *Id.* at 655 (emphasis in

United States District Court

For the Northern District of California

1    the principal debtor, Polar Air Cargo, Inc., that exceed the amount of money that Wells Fargo seeks

2    to recover against Polaris as an alleged guarantor and/or (b) should be applied to offset and therefore

3    eliminate any amounts claimed by Wells Fargo against Polaris"), and there is evidence that Polaris

4    did make a demand of WF that it pursue its remedies against Polar first.  *See* Kieve Sur-Reply Decl.,

5    Ex. 5 (Flynn Dep. at 82-83) (stating that Polaris refused to pay the six months of rent and that Polaris

6    told him that WF "had plenty of reserves [from Polar]").

7         The Court therefore turns to the question of WF's application of the $17.2 million.  WF

8    contends that application here is *not* governed by California Civil Code § 1479, apparently on the

9    basis that the $17.2 million in security deposits and maintenance reserves constitute "security" and

10   not "performance" under § 1479.  *See* Cal. Civ. Code § 1479 (discussing order of allocation "[w]here

11   a debtor, under several obligations to another, does an act, by way of performance, in whole or in

12   part, which is equally applicable to two or more of such obligations").  According to WF, common

13   law principles govern allocation of the $17.2 million instead of § 1479.

14        WF, however, does not cite any authority to support its position.  What little case law there is

15   suggests that § 1479 contemplates action by the debtor.  *See, e.g.*, *Ricord v. Aragon*, 115 Cal. App.

16   2d 176, 179 (1953) ("There was, here, no act of performance by plaintiffs -- only a remission by the

17   defendants of a part of the debt.  Section 1479 does not apply.").  Here, the allocation of the security

18   and reserves was permitted by Polar's relinquishment of any claim thereto in settling with WF; in

19   substance, there was a transfer of value by Polar to WF by way of settlement, the functional

20   equivalent of payment.  Neither precedent, logic, nor policy counsel suggests why § 1479 should not

21   govern here.[15]

22   _____

23   original).  "Having made such an election, [the defendant could] not come in *on judgment day* and require [the plaintiff] to satisfy its judgment against other sources first . . . ."  *Id.* (emphasis added); *see*

24   *also United Cal. Bank v. Maltzman*, 44 Cal. App. 3d 41, 54 (1974) ("It is now too late for the sponsors to require *on appeal* that UCB proceed first against joint venture.") (emphasis added).

25        [15]  If the common law were applicable instead of § 1479, a similar analysis would apply.  The

26   first consideration is whether the debtor has expressed any intent regarding allocation and, if not, whether the creditor has made an allocation.  *See Pike v. Tuttle*, 18 Cal. App. 3d 746, 753 (1971) ("It is

27   settled that where none of the rules prescribed by the statute [§ 1479] cover or apply to the particular situation, application of a payment will be made on common law principles.  Payment will be applied

28   in the manner most consonent [sic] with justice and equity; therefore, under the prevailing rule where neither the creditor nor the debtor has made application of a payment, the court will apply it to a debt

**United States District Court**

For the Northern District of California

In the instant case, neither party has pointed to any evidence regarding debtor intent (*i.e.*, Polar's intent) with respect to the $17.2 million. As for creditor intent, WF argues that, under the lease agreements between itself and Polar, it was "expressly invested . . . with absolute discretion to apply maintenance reserves and security deposits to satisfy *any* Polar obligations under the Leases," Reply at 11, and, based on the Brinkman reply declaration, "[i]t is undisputed that Wells Fargo/TAF has not applied any of the security deposits and maintenance reserves held to rent guaranteed by Polaris." *Id.* at 12; *see also* Brinkman Reply Decl. ¶ 6 ("TAF has not applied any of the $17.2 million in security deposits and maintenance reserves collected under the Polar leases to rent guaranteed by Polaris."). That WF had a contractual right to apply the security as it saw fit does not establish what it actually did. As to what WF did, as discussed above, there is a credibility issue with respect to Ms. Brinkman's declaration, thus making summary judgment inappropriate. Moreover, Ms. Brinkman's declaration does not establish that application of the security deposits and maintenance reserves was made within a reasonable time. Finally, as noted above, there are factual issues as to what obligations were existing at the time of the application. Thus, as above, summary judgment in favor of WF as to the timely application of the $17.2 million security is denied.

## V.   EXONERATION

Polaris contends that, even if there are genuine issues of fact regarding allocation, Polaris is entitled to summary judgment, because there is no genuine dispute that Polaris as a surety is entitled to exoneration under California Civil Code § 2819. This section provides that

> [a] surety is exonerated, except so far as he or she may be indemnified by the principal, if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended. However, nothing in this

---

existing at the time of payment and to the relief of one secondarily liable thereon rather than apply it on a 'subsequently incurred debt.'"); *Bank of Am. Nat'l Trust & Sav. Ass'n. v. Kelsey*, 6 Cal. App. 2d 346, 351-52 (1935) ("It has been long ago declared by the Supreme Court that it may now be considered as the settled rule in this country, wherever the common law prevails, that when neither the debtor nor creditor makes any application of a payment on a debt, and there are different debts due from the debtor to the creditor, the law will make the application in such a manner, in view of all the circumstances of the case, as is most in accordance with justice and equity, and will best protect and maintain the rights of both parties . . . .").

**United States District Court**

For the Northern District of California

1  section shall be construed to supersede subdivision (b) of Section
2  2822.

3  Cal. Civ. Code §2819.  According to Polaris, it is exonerated under § 2819 because WF entered into

4  a settlement with Polar and fully released Polar from liability without Polaris's knowledge or

5  consent.  *See R.P. Richards, Inc. v. Chartered Constr. Corp.*, 83 Cal. App. 4th 146, 154 (2000)

6  ("The promisee's release of the principal extinguishes the principal obligation and impairs the

7  promisee's rights and remedies against the principal within the meaning of section 2819.").

8        The Court rejects Polaris's argument.  Based on the evidence submitted, the settlement

9  between WF and Polar involved three elements: (1) a reduction in WF's bankruptcy claim from

10  some $36 million to a $15 million unsecured claim; (2) Polar's giving up its claim to any part of the

11  $17.2 million in security; and (3) Polar's release of WF from liability related to the lease agreements.

12  Neither (2) nor (3) constituted an alteration of Polar's "obligation" to WF.  Polar's relinquishment of

13  its claim to any part of the security did not alter any Polar *obligation to* WF; it concerned only

14  Polar's *rights against* WF.  Similarly, Polar's release of WF from liability involved Polar's *rights*

15  *against* WF, not any of its *obligations to* WF.  For the same reasons, WF's rights (and thus Polaris's

16  rights as a potential subrogee to WF) against Polar were not impaired.  Absent such impairment of

17  the surety's rights, the surety is not exonerated under § 2819.  *See Conner v. Conner*, 76 Cal. App.

18  4th 646, 650 (1999) ("'[Section 2819] serves to release a guarantor whose subrogation rights against

19  the debtor are impaired.'") (quoting *Bennett v. Leatherby*, 3 Cal. App. 4th 449, 452 (1992)); *see also*

20  *United Pacific Ins. Co. v. United States Dep't of Interior*, 70 F. Supp. 2d 1089, 1096 (C.D. Cal.

21  1999) (noting that a surety is discharged where, *inter alia*, "a [creditor's] late-filed [bankruptcy]

22  claim impairs the surety's remedies against the principal").

23        As for the agreement that WF's bankruptcy claim would be reduced from some $36 million

24  to $15 million, this too did not release Polar from all liability to WF.  Rather, as was reflected in

25  Polar's filing with the bankruptcy court, of which Polaris had notice, *see* Stip. ¶ 32, the $15 million

26  proceeded as an unsecured claim in bankruptcy.  *See id.*, Ex. 8.  Polaris is not exonerated simply

27  because of the reduction in the amount of the bankruptcy claim.  Section 2819 specifically provides

28

**United States District Court**

For the Northern District of California

that "nothing in this section shall be construed to supersede subdivision (b) of Section 2822," Cal. Civ. Code § 2819, and § 2822(b) states that,

> [f]or purposes of this section and Section 2819, an agreement by a creditor to accept from the principal debtor a sum less than the balance owed on the original obligation, without the prior consent of the surety and without any other change to the underlying agreement between the creditor and principal debtor, shall not exonerate the surety for the lesser sum agreed upon by the creditor and principal debtor.

*Id.* § 2822(b) (emphasis added); *see also R.P. Richards*, 83 Cal. App. 4th at 154 n.6 (noting that, if promisee agrees to accept from principal less than full amount due on original obligation without surety's prior consent and without any other change to underlying agreement between creditor and principal debtor, § 2819 does not exonerate surety from liability for lesser agreed amount (citing § 2822(b)); *V.I.P. Agency of N. Cal., Inc. v. Duffy Elecs., Inc.*, 92 Cal. App. 3d 849, 852 (1979) (stating that reduction in amount of debt due creditor reduced surety's exposure but was not an alteration of obligation; therefore, no exoneration).

Polaris points out that § 2822(b) hinges on there being no other change to the underlying agreement between WF, as creditor, and Polar, as debtor. But Polar's giving up its claim to any part of the security and its release of WF (which involved Polar's right to the security) did not constitute a change to the underlying agreement. The agreement -- combining the relinquishment of security and embodiment of Polar's remaining lease obligations into an unsecured claim in bankruptcy -- concerned only the *amount* of money to be accepted by WF for Polar's obligation. This did not effectuate a change in the underlying obligation. At most, the reduction in the unsecured bankruptcy claim constituted an agreement by the creditor to accept less than the balance owed. Rather than complete exoneration, under § 2822(b), Polaris's potential exposure was reduced accordingly.[16] *Cf. United Pacific Ins. Co.*, 70 F. Supp. 2d at 1093 (noting that creditor's return of preference payments made within context of bankruptcy did not change underlying obligation).

---

[16] Under § 2822(b), Polaris obtained the benefit of the reduction in the bankruptcy claim; the problem for Polaris is that the reduction to $15 million is of no practical benefit because its limited guarantee was well below that amount, *i.e.*, some $4 million.

**United States District Court**

For the Northern District of California

1    Polaris suggests still that exoneration is proper under California Civil Code § 2825.  This

2    statue provides that "[a] surety is not exonerated by the discharge of his principal by operation of

3    law, without the intervention or omission of the creditor."  Cal. Civ. Code § 2825.  Polaris

4    acknowledges that Polar was ultimately discharged from liability to WF pursuant to the bankruptcy

5    proceedings and that a discharge in bankruptcy is by operation of law.  *See Zellner v. Lasky*, 13 Cal.

6    App. 3d 787, 792 (1970) (noting that, under bankruptcy law, the liability of a surety for a bankrupt

7    shall not be altered by the discharge of the bankrupt and that this is reflected in state law in § 2825).

8    However, Polaris points to the language "without the intervention or omission of the creditor," Cal.

9    Civ. Code § 2825, as an exception thereto and as the basis for exoneration in the instant case.

10   According to Polaris, there was an act of "intervention" by WF as the creditor, namely, its settlement

11   with and release of Polar.  *See* Opp'n at 9 (citing *R.P. Richards*, 83 Cal. App. 4th at 155 (stating that

12   promisee's release of principal without surety's prior knowledge is action that causes principal's

13   liability to cease within meaning of §§ 2810 and 2825, resulting in exoneration of surety)).

14   There are several problems with this argument.  First, as noted above, the settlement

15   agreement did not release Polar.  *See* Stip., Ex. 8 (Polar representing to bankruptcy court that WF's

16   claim was settled -- "[r]educe [claim] and allow as an unsecured claim in the amount of

17   $15,000,000").  The release was effectuated by the bankruptcy discharge (by operation of law), not

18   the reduction in the bankruptcy claim amount.  The settlement did not include a voluntary general

19   release of the debtor which would exonerate the surety.  *Cf. Bennett*, 3 Cal. App. 4th at 453 ("[T]he

20   right of subrogation has been impaired by the creditor's complete release of the two partners of the

21   sublessee."); *Food Lion, Inc. v. S.L. Nusbaum Ins. Agency*, 202 F.3d 223, 228 (4th Cir. 2000)

22   (concluding that debtor was not discharged in bankruptcy but rather was released as a result of

23   consensual agreed-upon order); *NCNB Texas Nat'l Bank v. Johnson*, 11 F.3d 1260, 1266 (5th Cir.

24   1994) (stating that reorganization proceedings under Chapter 11 are judicial, not contractual, and do

25   not exonerate surety).

26   Second, the argument fails because "intervention" has a specific meaning under § 2825,

27   namely, "'[an] act of the creditor which would naturally prove injurious to the remedies of the surety

28   or inconsistent with his rights, or which lessens his security.'"  *Duerr v. Sloan*, 50 Cal. App. 512,

26

518 (1920) (quoting California Civil Code § 2840, which was repealed in 1939).[17]  In the instant

case, the settlement between WF and Polar was not injurious to Polaris because as noted above, the

settlement did prevent Polaris as a surety from pursuing any of its remedies or rights against Polar.

*See* Cal. Civ. Code § 2847 (providing that a principal is bound to reimburse its surety if the surety

satisfies the principal obligation or any part thereof); *id.* § 2848 (providing that, once a surety

satisfies the obligation of the principal, the surety is entitled to enforce every remedy that the creditor

has against the principal). *See, e.g.*, *Lamb v. Whalenmaeir*, 144 Cal. 91, 95 (1904) ("The surety has

an immediate right of action against the principal for reimbursement of any payment enforced

against him by the creditor; but if, by act of the creditor, he will be unable to proceed against the

principal, he is for that reason discharged from liability to the creditor.").  The settlement agreement

did not release Polar from all liability in a manner which impaired Polaris's rights as a surety against

Polar.  What prevented Polaris from pursuing reimbursement from Polar, either directly or by way of

subrogation through WF, was not the settlement between WF and Polar which simply reduced the

amount of the bankruptcy claim.  Rather, it was the discharge through bankruptcy itself.  Polaris's

legal rights would have been similarly extinguished even if there had been no settlement reducing

WF's unsecured claim.  Accordingly, the settlement did not constitute an "intervention or omission"

of WF within the meaning of § 2825.  *Cf. Apache Lanes, Inc. v. National Educators Life Ins. Co.*,

529 P.2d 984, 986-97 (Okla. 1974) (noting that, under statute comparable to § 2825, surety was

exonerated because failure of creditor to seek deficiency judgment led to discharge of debtor's

obligation).

    Moreover, it should be noted that Polaris knew that Polar was in bankruptcy and knew of the

settlement between WF and Polar.  Polaris knew WF's reduced claim would be treated as an

unsecured claim on the bankruptcy estate.  *See* Stip., Ex. 8.  Polaris presumably knew that the

"discharge of a debt of the debtor [in bankruptcy] does not affect the liability of any other entity on,

---

[17] That § 2840 was repealed in 1939 does not mean that "intervention" under § 2825 now has a different meaning.  The history of the two statutes is important to take into consideration.  Section 2840 was enacted in 1872, at the same time as § 2825.  Section 2840 was applicable to sureties, and § 2825 to guarantors.  In 1939, the distinction between sureties and guarantors was abolished, and § 2825 was amended to read "surety" instead of "guarantor."  With this amendment, § 2840 was essentially superfluous, and presumably it was therefore repealed.

United States District Court

For the Northern District of California

1    or the property of any other entity for, such debt," 11 U.S.C. § 524(e), including a surety.  *See*

2    *Forsyth v. Jones*, 57 Cal. App. 4th 776, 781 (1997) ("[F]ollowing discharge [from bankruptcy], a

3    plaintiff or other creditor may not seek to hold the debtor personally liable for any debt, but may

4    proceed against either a codebtor or a surety or guarantor who guaranteed the debtor's payment of

5    that debt."); *R.I.D.C. Indus. Dev. Fund v. Snyder*, 539 F.2d 487, 491 (5th Cir. 1976) (stating that

6    discharge in bankruptcy will not alter liability of guarantor).  Yet Polaris did nothing in the

7    bankruptcy proceeding to protect its own rights therein, *e.g.*, by presenting a contingent claim to the

8    bankruptcy court or objecting to the settlement.  *Cf. Conner*, 76 Cal. App. 4th at 651 (noting that

9    silence on surety's part to the reorganization plan or creditor's action in bankruptcy can be viewed as

10   consent and implied approval).

11          To be sure, an argument could be made that the settlement between WF and Polar was

12   injurious to Polaris because, if WF did not give up its claim for $36 million -- or at least obtained

13   more than $9 million -- then it perhaps could have obtained enough money from the bankruptcy,

14   along with the $17.2 million in security, to cover the six months of rent guaranteed by Polaris.

15   Polaris, however, made no such argument to the Court, simply claiming instead that the settlement

16   was problematic because it entailed a release of Polaris from liability.  *See* Opp'n at 9.  But, even if

17   this argument had been presented, it is not persuasive.  First, it is not at all clear that WF received

18   less value than that to which it was entitled.  In addition to the $15 million unsecured claim, it

19   obtained $17.2 million in security.  Polaris has not established that WF did not act diligently in

20   protecting WF's and Polaris's interests.  *See, e.g.*, *Silberstein v. Kitrick*, 35 Cal. App. 91, 97-98

21   (1917) ("'The neglect [of the creditor] to resort to a fund already in his hands for his own protection

22   in the very matter for which the defendant was a surety, and which fund was therefore charged with a

23   trust in favor of appellant, and its surrender without his consent constitutes a defense to this

24   action.'"); *Conner v*, 76 Cal. App. 4th at 651 (concluding that creditor acted reasonably).

25          Moreover, as discussed above, § 2825 is designed to ensure that a creditor does not

26   compromise the ability of a surety to pursue its legal remedies and rights against the debtor.  The

27   willingness of a creditor to accept less than the full obligation from a debtor does not prevent a

28   surety from pursuing the debtor.  *See id.* at 650-52 (noting that, while a creditor has a duty to protect

28

the interests of the surety, the creditor is not required to subordinate his rights to better the position of the surety -- "'[i]t is the duty of the creditor, so far as he can, consistently with the security of his own rights, to protect the interests of the surety as well as his own'").  Section 2825 must be considered in conjunction with § 2822(b) as part of a larger statutory scheme.  Even though § 2822(b) is not specifically referenced in § 2825 as it is in § 2819, § 2822(b) still informs the interpretation of § 2825.  All the statutes should be read *in pari materia*.  Both § 2825 and § 2819 concern acts of the creditor that could impair the subrogation rights of the surety.  *See* Cal. Civ. Code § 2819 ("A surety is exonerated . . . if by any act of the creditor, without the consent of the surety . . . the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended.").  Under § 2822(b), creditors and debtors are permitted to negotiate reductions in the amount of money due without the complete exoneration of the surety.  The fact that such a negotiation occurs in the context of or during the pendency of a bankruptcy proceeding to which § 2825 applies, should not alter the analysis.

The Court therefore denies Polaris's motion for summary judgment based on the argument that it is exonerated pursuant to §§ 2819 and 2825.

## VI.   CONCLUSION

For the foregoing reasons, the Court denies both parties' motions for summary judgment.  There is a genuine dispute as to the allocation of the bankruptcy payment and the security deposits/maintenance reserves pursuant to California Civil Code § 1479.  Furthermore, Polaris is not exonerated under California Civil Code §§ 2819 and 2825.

All remaining evidentiary objections not addressed herein are denied as moot.

This order disposes of Docket Nos. 32 and 43.


IT IS SO ORDERED.


Dated:  August 9, 2005

_____
EDWARD M. CHEN
United States Magistrate Judge

United States District Court

For the Northern District of California

29